## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| BRITT DECKER,<br>c/o KRAMON & GRAHAM, P.A.<br>One South Street, Suite 2600<br>Baltimore, Maryland 21202,<br><br>    individually, and on behalf of all<br>    others similarly situated,<br><br>       Plaintiff,<br><br>    v.<br><br>US FERTILITY, LLC,<br>9600 Blackwell Road, Suite 500,<br>Rockville, Maryland 20850<br>Montgomery County, Maryland,<br><br>       Defendant. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>JURY TRIAL DEMANDED |

Plaintiff Britt Decker ("Plaintiff"), individually, and on behalf of all others similarly situated, alleges the following against Defendant US Fertility, LLC. ("Defendant" or "US Fertility"), based upon personal knowledge and on information and belief derived from, among other things, investigation of counsel and a review of public documents as to all other matters:

## <u>INTRODUCTION</u>

1. Defendant formed in 2020 through a partnership of healthcare-focused investment firms and independent fertility practices, becoming one of the largest networks of fertility practices in the United States.[1] Indeed, Defendant describes itself as the "Largest Network of Fertility

---

[1] *See US Fertility Becomes the Largest Physician-Owned, Physician-Led Network of Fertility Practices in the Nation*, BusinessWire (Sept. 22, 2020), available at: https://www.businesswire.com/news/home/20200922005342/en/US-Fertility-Becomes-the-Largest-Physician-Owned-Physician-Led-Network-of-Fertility-Practices-in-the-Nation.

Centers in the USA," with at least 55 locations across the United States.[2] Defendant provides its affiliated clinics with "technical platforms to effectively manage clinical and business systems, facilities and operations, finance and accounting, physician recruitment and credentialing, legal, risk management, lab operations, business development, and fertility treatment financing programs."[3]

2.      In order to access and utilize those platforms and programs, however, the partnership's members must entrust Defendant with their most sensitive and valuable resource: the personal and medical information of its patients, including names, dates of birth, addresses, Social Security Numbers, driver's license/state identification numbers, passport numbers, medical treatment and diagnosis information, medical records, health insurance and claims, credit/debit card information, financial account information, and other protected health information ("personal identifying information" or "PII").

3.      Indeed, patients and prospective patients of Defendant and its members are and were required to provide their PII, including protected health information, as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), regardless of whether they ultimately receive treatment. Defendant is required to protect that information, including adopting and implementing data security regulations and standards set forth in HIPAA, particularly due to the sensitive and personal nature of the fertility treatments Defendant and its members provide.

4.      However, despite being one of the nation's largest and foremost fertility networks, Defendant failed to invest in adequate data security, allowing malevolent actors to compromise its patients' sensitive personal information through a ransomware attack.

---

[2] *See About US Fertility*, US Fertility, https://www.usfertility.com/about-us-fertility/ (last visited Feb. 11, 2021).
[3] *Supra* note 1.

5.      Between approximately August 12, 2020 and September 14, 2020, Defendant experienced a data breach through which hackers exfiltrated the PII of both actual patients and prospective patients like Plaintiff (the "Data Breach").

6.      Critically, many of the categories of PII exposed in the breach, like Social Security numbers or driver's license numbers, cannot be changed. Yet, Defendant did not disclose the Data Breach to Plaintiff and other affected patients until months after discovering the Data Breach, virtually ensuring that the criminals who exploited Defendant's failure could monetize, misuse and/or disseminate the PII they misappropriated from Defendant before Plaintiff and others could take affirmative steps to protect their identities and PII. Now, Plaintiff and similarly situated persons will for years suffer the significant and concrete risk that their PII will be (or already has been) misappropriated

7.      Defendant's failure to take adequate and reasonable measures to ensure its data systems were protected and all available steps to prevent and stop the Data Breach from occurring, as well as failing to disclose to patients and consumers the material facts that it did not have adequate computer systems and security practices to safeguard their PII, and failing to timely detect and provide adequate notice of the Data Breach has caused substantial harm and injuries to Defendant's patients and consumers across the country.

8.      As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff's and Class members' PII was accessed and acquired by cybercriminals for the express purpose of misusing the data and causing further irreparable harm to Plaintiff's and Class members' personal, financial, reputational, and future well-being. Plaintiff and Class members face the real, immediate and likely danger of identity theft and the misuse of their PII, especially because their PII was

specifically targeted by the hackers. Indeed, news reports indicate this information Defendant allowed to be compromised already has found its way to the dark web, where it may be bought, sold and transferred in perpetuity, causing Plaintiff and the Class untold harm.

9.     Accordingly, Plaintiff brings this action against Defendant for its failure to reasonably safeguard Plaintiff's and Class members' PII, failure to reasonably provide timely notification that Plaintiff's and Class members' PII had been accessed and acquired by an unauthorized third party, and for intentionally and unconscionably deceiving Plaintiff and Class members relating to the status, safety, location, access, and protection of their PII.

10.     Plaintiff brings claims against Defendant for statutory violations, as well as negligence, negligence *per se*, unjust enrichment, bailment, and declaratory judgment.

## PARTIES

11.     Plaintiff Decker is a citizen and resident of Illinois.

12.     In or around November 16, 2018, Plaintiff and her spouse consulted with Fertility Centers of Illinois ("FCI") at its River North Clinic/IVF Center located in Chicago, Illinois. FCI is a member of the US Fertility partnership, which in turn provides FCI, through Defendant, information technology platforms and services. In advance of her consultation, Plaintiff provided FCI with considerable amounts of sensitive PII, including but not limited to: her medical history, health information, Social Security number, date of birth, address, telephone number, and insurance information.

13.     Plaintiff provided FCI and its agents her PII with the reasonable expectation and understanding that it would be protected and safeguarded from compromise, disclosure, and misuse by unauthorized users and would be timely and forthright relating to any data security incidents involving her PII.

4

14.     On or about January 8, 2021, Defendant sent Plaintiff a letter titled "Notice of Data Incident" informing Plaintiff that between August 12, 2020 and September 14, 2020, Plaintiff's PII was accessed by one or more unauthorized persons.

15.     The Notice of Data Incident stated that on December 4, 2020, Defendant determined that Plaintiff's name, date of birth, Social Security Number, and patient number were accessed by the unauthorized actor(s).

16.     On information and belief, additional PII belonging to Plaintiff was accessed by the hackers in the Data Breach.

17.     Although Defendant has known of the Data Breach since at least September 2020, Plaintiff did not learn that her PII had been exfiltrated due to Defendant's failures until she received the Notice of Data Incident months later. This delay deprived Plaintiff of the opportunity to take affirmative steps to protect her identity before criminals could further abuse and monetize it.

18.     The Data Breach already has required Plaintiff to expend significant time and effort to protect herself from its potential adverse consequences, including but not limited to investigating whether hackers have further attempted to misuse her PII, and potential means by which to protect herself from identity theft, such as placing freezes on her credit accounts at the three major credit bureaus, reviewing her credit reports, and monitoring associated bank and credit accounts.

19.     As a direct and proximate result of the Data Breach, and Defendant's failure to prevent against and timely notify Plaintiff of the same, Plaintiff has suffered concrete injuries. Plaintiff's damages also include the heightened risk of fraud and identity theft to which the Breach exposed her.

20.     Plaintiff would not have entrusted her PII to a clinic associated with Defendant had Defendant disclosed that it lacked computer systems and data security practices sufficient to adequately safeguard the incredibly sensitive PII of Plaintiff and the Class.

21.     Defendant US Fertility LLC is a Delaware limited liability company headquartered at 9600 Blackwell Road, Suite 500, Rockville, Maryland 20850. Defendant is partnered with at least 55 clinics in more than a dozen States, including FCI in Chicago, Illinois.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and Defendant is a citizen of a State different from that of at least one Class member. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendant because it is authorized to and regularly conducts business in Maryland, and is headquartered in Rockville, Maryland.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

## GENERAL ALLEGATIONS

### US Fertility LLC — Background

25.     Defendant formed in May 2020 when the private equity investment firm Amulet Capital Partners, LP partnered with Shady Grove Fertility—one of the largest fertility practices in the United States—FCI, Reproductive Science Center of the San Francisco Bay Area, and IVF

Florida. Additional fertility practices later joined the partnership. Defendant, the product of this partnership, then became the largest network of fertility clinics in the United States, with 55 locations in more than a dozen States, serving hundreds of thousands of patients.

26.     Defendant provides its affiliated practices administrative, clinical, technical and business platforms, including "Secure Data Management," "Business and Operational Support," and "Patient Financial Services."[4]

27.     Indeed, Defendant boasts that it provides a "secure suite" of platforms, including "secure, cloud-based platforms" that start with "security . . . that will scale with growth and respond to the ever-changing healthcare and technology landscape," and that its platforms provide "on premise and cloud hosting, network security, [and] monitoring."[5]

28.     Defendant further claims that it provides its affiliated clinics with "advanced business and digital solutions" and a "variety of technical platforms to effectively manage clinical and business information systems, facilities and operations, finance and accounting, . . . legal, [and] risk management."[6] The goal of Defendant's platforms is to take all "non-clinical, administrative business functions" off the shoulders of their affiliated partners, so that the physicians can instead focus on patient care.[7] Thus, as fertility clinics, such as FCI joined the partnership and allowed Defendant to manage and secure their information systems, they entrusted Defendant with all PII with which actual and prospective patients previously had entrusted them.

---

[4] *See Practice Success*, US Fertility, available at: https://www.usfertility.com/physicians/practice-success/ (last visited Feb. 11, 2021).
[5] *Id.*
[6] *See About US Fertility*, US Fertility, available at: https://www.usfertility.com/about-us-fertility/ (last visited Feb. 11, 2021).
[7] *Id.*

29.     Despite Defendant's promises and representations to provide adequate data security, it failed to protect patient PII, which unauthorized persons exfiltrated during the Data Breach.

30.     On or about August 12, 2020, hackers were able to gain access to Defendant's computer systems, including various US Fertility servers and workstations, and deploy what one technology publication referred to as "a common technique of data-stealing ransomware."[8]

31.     Specifically, during the month that the hacker(s) had unrestricted access to Defendant's computer systems, they were able to access and acquire personal, sensitive, and protected information belonging to patients and consumers, including but not limited to patients' and consumers' names, addresses, dates of birth, Social Security Numbers, driver's license/state identification numbers, passport numbers, medical treatment and diagnosis information, medical records, health insurance and claims, credit/debit card information, financial account information, and other protected health information, including information about a person's health or medical conditions, like test results and medical records. Ultimately, the breach impacted patients at roughly half of the 55 clinics Defendant operates.[9]

32.     On or about September 14, 2020, Defendant finally discovered that one or more hackers had accessed its computer systems when the hackers used ransomware to encrypt a number

---

[8] Zack Whittaker, *US Fertility says patient data was stolen in a ransomware attack*, TechCrunch (Nov. 26, 2020), available at https://techcrunch.com/2020/11/26/us-fertility-ransomware-attack/ (last visited Feb. 11, 2021).

[9] Sarah Coble, *Data Stolen from America's Largest Fertility Clinic Operator*, Infosecurity Magazine (Nov. 30, 2020), available at https://www.infosecurity-magazine.com/news/ransomware-us-fertility/ (last visited Feb. 11, 2020).

of servers and workstations connected to Defendant's computer systems, making those servers and workstations and the data captured thereon inaccessible.[10]

33.    According to Defendant, and as set forth in its Notice of Data Security Incident, rather than pay the ransom, it engaged unidentified third-party forensic specialists who determined that

> data on a number of servers and workstations connected to our domain had been encrypted by ransomware. We proactively removed a number of systems from our network upon discovering the Incident . . . . On November 13, 2020, we began receiving the results of this review and determined that the following information relating to certain individuals was included in the impacted files when they were accessed without authorization: names, addresses, dates of birth, MPI numbers, and Social Security numbers . . . .

34.    Despite learning of the results of its commissioned audit on November 13, and having become aware of the Data Breach generally on September 14, 2020, Defendant waited until approximately November 25, 2020, to disclose to the general public that it has suffered a Data Breach, and that patient and consumer PII was accessed by unauthorized persons. Moreover, when Defendant finally acknowledge that it was subject to the Data Breach, it simply posted a notice on its website, rather than provide direct notice to victims of the Data Breach (the "First Notice").

35.    In January 2021, Defendant and its affiliated clinics posted a subsequent notice on their websites regarding the Data Breach (the "Second Notice"). The Second Notice was posted near the bottom of the homepage of the websites under the innocuous header "Notice of Data Incident."

36.    The Second Notice acknowledged that the hackers had accessed additional patient and consumer PII, including medical treatment information, credit/debit card information, and

---

[10] Zack Whittaker, *US Fertility says patient data was stolen in a ransomware attack*, TechCrunch (Nov. 26, 2020), available at https://techcrunch.com/2020/11/26/us-fertility-ransomware-attack/ (last visited Feb. 11, 2021).

financial account information. The Second Notice disclosed that Defendant learned on December 4, 2020, that the hackers had accessed this additional PII. Defendant, in other words, waited one month after learning of the broad scope of the Data Breach—and approximately four (4) months after first discovering the Data Breach—before notifying patients  and consumers that they had been victimized during the Data Breach.

37.     On or about January 8, 2021, Defendant sent direct notice to victims of the Data Breach, notifying them that their PII had been accessed by unauthorized persons starting on August 14, 2020. Plaintiff and Class members therefore did not receive direct notice of the Data Breach until approximately five (5) months after the Data Breach began, and approximately four (4) months after Defendant became aware of the Data Breach.

38.     Defendant's failure to properly safeguard Plaintiff's and Class members' PII allowed cybercriminals to access their PII undetected for more than a month, and its failure to promptly notify Plaintiff and other victims of the hack that their PII had been misappropriated during the Data Breach precluded them from taking meaningful steps to safeguard their identities before their PII was further disseminated.

39.     The length of the Data Breach also demonstrates the inadequacies inherent in Defendant's network monitoring procedures: had Defendant properly monitored its computer systems, it would have discovered the Data Breach much sooner.

40.     In short, Defendant's myriad failures—including to timely detect the Data Breach and notify Plaintiff and Class members that their PII had been exfiltrated due to Defendant's security failures—allowed cybercriminals to misuse Plaintiff's and Class members' PII undetected for five months before Defendant finally granted them the opportunity to take proactive steps to defend themselves and mitigate the risk of identity theft.

*Data Breaches Pose Significant Threats to Consumers*

41.     Data breaches have become a constant threat that, without adequate safeguards, can expose consumer data to malicious actors.

42.     In 2018, the Identity Theft Resource Center and CyberScout Annual End-of-Year Data Breach Report revealed a 126% increase in exposed consumer data.[11] Between January and July 2019, more than 31.6 million healthcare records were exposed in data security incidents—more than double the total amount of healthcare data breaches for all of 2018.[12]

43.     In fact, Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, estimates that the annual number of data breaches occurring in the United States increased by approximately 692% between 2005 and 2018, a year during which over 446.5 million consumer records were exposed due to data breach incidents.[13] Conditions have only worsened since: Statista estimates that "[i]n 2019, the number of data breaches in the United States amounted to 1,473 with over 164.68 million sensitive records exposed[,]" and that "[i]n the first half of 2020, there were 540 reported data breaches."[14]

44.     Data breaches are a constant threat because of the price that PII are sold for on the dark web. According to Experian, medical records sell on the dark web for prices that are hundreds

---

[11] Identity Theft Resource Center, End of Year Data Breach Report (2018).
[12] Steve Adler, *First Half of 2019 Sees 31.6 Million Healthcare Records Breached*, HIPAA Journal (Aug. 2, 2019), available at: https://www.hipaajournal.com/first-half-of-2019-sees-31-million-healthcare-records-breached.
[13]     https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-unitedstates-by-number-of-breaches-and-records-exposed.
[14] *Id.*

or thousands of times the price of basic personal or financial information.[15] Passport numbers can be sold for even significantly more.[16]

45.     When a data breach occurs—especially when the breach concerns medical or financial information—victims must spend significant time, energy, and effort to protect themselves. Cybercriminals use PII to commit identity theft, such as making fraudulent transactions and obtaining consumer credit using the victim's financial information.

46.     Data breaches involving medical and health information, like the one here at issue, amplify those risks considerably because of the access it provides to criminals.

47.     When the PII includes medical information, the identity theft could extend to sending the victim fake medical bills or obtaining medical services using the victim's insurance or financial information, which can result in unknown, unpaid bills being sent to collections or using the victim's health insurance.[17]

48.     Moreover, unlike victims of just credit card identity theft, victims of medical records data breaches cannot simply "reverse" fraudulent transactions.[18] As such, victims of data breaches in which hackers misappropriate highly sensitive patient PII often are unable to recover the losses they suffer as a result thereof, and must expend additional time and money to mitigate and protect themselves from further attempts at identity theft. One study found that the majority of medical identity theft victims had to pay an average of $13,500 to resolve issues stemming from

---

[15] *See* Brian Stack, *Here's How Much Your Personal Information is Selling for on the Dark Web*, Experian (Dec. 6, 2017), available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[16] *See id.*

[17] Medical Identity Theft, Federal Trade Commission (Jan. 2011), available at: https://www.bulkorder.ftc.gov/system/files/publications/bus75-medical-identity-theft-faq-health-care-health-plan.pdf.

[18] *See The $300 Billion Attack: The Revenue Risk and Human Impact of Healthcare Provider Cyber Security Inaction*, Accenture, available at: https://www.accenture.com/_acnmedia/PDF-54/Accenture-Health-Cybersecurity-300-Billion-at-Risk.pdf (last visited Feb. 12, 2021).

the data breach, and only 10% of victims achieve a completely satisfactorily resolution.[19] Almost one-third of medical identity theft victims lost their health insurance as a result of the identity theft.[20]

49.     As explained by Kunal Rupani, director of product management at Accellion, a private cloud solutions company, in the context of a different medical data breach:

> Unlike credit card numbers and other financial data, healthcare information doesn't have an expiration date. As a result, a patient's records can sell on the black market for upwards of fifty times the amount of their credit card number, making hospitals and other healthcare organizations extremely lucrative targets for cybercriminals.[21]

50.     SecureWorks, a division of Dell Inc., echoed that sentiment, noting that "[i]t's a well known truism within much of the healthcare data security community that an individual healthcare record is worth more on the black market ($50, on average) than a U.S.-based credit card and personal identity with social security number combined."[22] The reason is that thieves "[c]an use a healthcare record to submit false medical claims (and thus obtain free medical care), purchase prescription medication, or resell the record on the black market."[23]

51.     Similarly, the FBI Cyber Division in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims,

---

[19] *See Fifth Annual Study on Medical Identity Theft*, Ponemon Institute LLC (Feb. 2015), at pp.2, 7, available at: https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.
[20] *Id.*
[21] Jeff Goldman, 21st Century Oncology Notifies 2.2 Million Patients of Data Breach (Mar. 11, 2016), http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last visited Feb. 11, 2021).
[22] What's the Market Value of a Healthcare Record, Dell SecureWorks (Dec. 13, 2012), https://www.secureworks.com/blog/general-market-value-of-a-healthcare-record (last visited Feb. 11, 2021).
[23] *Id.*

obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[24]

52.     In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities like Defendant charged with maintaining and securing patient PII know the importance of protecting that information from unauthorized disclosure. Indeed, on information and belief, Defendant was aware of highly publicized security breaches where PII and protected health information was accessed by unauthorized cybercriminals, including breaches of computer systems involving: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[25]

53.     In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and patient information.

54.     The risks medical identity theft poses can persist indefinitely, and for now and years to come Plaintiff and Class members will suffer the significant and concrete risk that their PII will be (or already has been) misappropriated, and that their identities will be stolen.

55.     Like protected health information, the other categories of PII compromised in the Data Breach pose lifelong concerns. While consumers can change a credit card numbers or open

---

[24] Federal Bureau of Investigation, FBI Cyber Division Private Industry Notification (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last visited Feb. 11, 2021).
[25] *See e.g.*, *Healthcare Data Breach Statistics*, HIPAA Journal, available at: https://www.hipaajournal.com/healthcare-data-breach-statistics (last accessed Feb. 15, 2021).

a new bank account in response to a breach, Plaintiff and the Class cannot change their Social Security or driver's license numbers.

56.     Neal O'Farrell, a security and identity theft expert for Credit Sesame, calls a Social Security number "your secret sauce," that is "as good as your DNA to hackers."[26]

57.     Unfortunately, Plaintiff and Class members have to wait until they become victims of Social Security number misuse before they can obtain a new one. But even then, the Social Security Administration warns "that a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start." In fact, "[f]or some victims of identity theft, a new number actually creates new problems."[27] One of those new problems is that a new Social Security number will have a completely blank credit history, making it difficult to get credit for years unless it is linked to the old compromised number.

### US Fertility had a Duty and Obligation to Protect Patient and Consumer PII

58.     Defendant has an obligation, statutorily and self-imposed, to keep confidential and protect from unauthorized access and/or disclosure patient and consumer PII. Defendant's obligation to protect PII is derived from: 1) government regulations, including HIPAA and FTC rules and regulations; 2) industry standards; and 3) promises and representations made to patients and consumers. Plaintiff and Class members provided, and Defendant obtained, their PII on the understanding that Defendant would protect and keep the PII from unauthorized access or disclosure.

---

[26] Cameron Huddleston, How to Protect Your Kids From the Anthem Data Breach, Kiplinger, (Feb. 10, 2015), http://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html# (last visited Feb. 11, 2021).
[27] Social Security Admin., Identity Theft and Your Social Security Number, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 11, 2021).

59.     HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII, regularly review access to data bases containing protected information, and procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

60.     Additionally, HIPAA requires Covered Entities and Business Associates to provide notification to every affected individual following the impermissible use or disclosures of any protected health information. The individual notice must be provided to affected individuals without unreasonable delay and no later than 60 days following discovery of the breach. Further, for a breach involving more than 500 individuals, entities are required to provide notice in prominent media outlets. *See* 45 CFR § 164.400, *et seq.*

61.     Defendant publicly admits that it is subject to HIPAA,[28] and represents to and promises consumers that it will "maintain[] protected health information in compliance with HIPAA and our contractual obligations to the Network Practices."[29] As such, Defendant represents and promises patients and customers that it will comply with HIPAA requirements concerning the protection of PII and prompt and adequate notification of data breaches.

62.     Additionally, the Federal Trade Commission's ("FTC") Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

---

[28] *See Privacy Statement*, US Fertility, https://www.usfertility.com/privacy-statement/ (last visited Feb. 12, 2021) ("As a Business Associate of the Network Practices, which are Covered Entities under [HIPAA] . . . .").
[29] *Id.*

63.     The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-marking.[30]

64.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[32] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33]

### *Defendant Violated HIPAA, FTC, and Industry Standard Data Protection Protocols*

65.     HIPAA obligates Covered Entities and Business Associates to adopt administrative, physical, and technology safeguards to ensure the confidentially, integrity, and security of consumer and patient PII.

---

[30]     Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[31] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.
[32] *Id.*
[33] *Id.*

66.     The FTC rules, regulations, and guidelines obligate business to protect PII, especially personal health records, from unauthorized access or disclosure by unauthorized persons.

67.     At all relevant times, Defendant was fully aware of its obligation to protect the customers and patient PII because it is a sophisticated business entity that is in the business of maintaining and transmitting PII, including personal health and medical records.

68.     Defendant was also aware of the significant consequences of its failure to protect PII for the tens of thousands of consumers and patients who provided their PII to Defendant and its affiliated clinics, and knew that this data, if hacked, would injure consumers, including Plaintiff and Class members.

69.     Unfortunately, Defendant failed to comply with HIPAA and FTC rules, regulations and guidelines, and industry standards concerning the protection and security of PII. Among its deficient practices, Defendant failed to implement security policies or procedures concerning, *inter alia*:

     a.   Developing and employing adequate intrusion detection systems;

     b.   Creating effective employee training on phishing attempts;

     c.   Engaging in regular reviews of audit logs and authentication records;

     d.   Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

     e.   Ensuring the confidentiality and integrity of consumer and patient PII, including protected health and information and records that Defendant or its affiliated clinics receive, maintain, or transmit;

f.   Protecting against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII;

g.   Implementing policies and procedures to prevent, detect, contain, and correct security violations;

h.   Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

i.   Implementing technical policies, procedures and safeguards for electronically stored information concerning protected health and medical information that permit access for only those persons or programs that have specifically been granted access; and

j.   Other similar measures to protect the security and confidentiality of customer and patient PII.

70.   Had Defendant implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. Defendant could have prevented or detected the Data Breach prior to the hackers encrypting Defendant's servers, systems, and workstations with ransomware; the amount and/or types of PII accessed by the hackers could have been avoided or greatly reduced; and consumers and patients would have been notified sooner, allowing them to take protective and mitigating actions sooner.

### Defendant's Data Security Practices are Woefully Inadequate and Inconsistent with its Self-Imposed Data Security Obligations

71.   Defendant purports to care about data security and safeguarding customer and patient PII. Defendant represents in its Privacy Policy that it will keep secure and confidential PII provided by consumers and patients to Defendant or any affiliated clinic. Specifically, Defendant

represents that it keeps PII in "a password-protected environment as a security measure to protect your data. We use administrative, physical, and technology safeguards to ensure confidentiality and integrity of data through audit controls, access controls, and data encryption. We also use industry standard SSL/TLS encryption to enhance security of electronic data transmissions."[34]

72.     However, Secure Socket Layer ("SSL") encryption protects information only in the course of its transmission, and not once it is stored, and "is not sufficiently secure."[35]

73.     Plaintiff and the Class thus entrusted their PII to Defendant in reliance on its promises and self-imposed obligations to keep their PII confidential, and to secure their PII from unauthorized access by malevolent actors. It failed to do so, in violation of its own privacy policies, due in no small part to its failure to properly secure its networks, servers, and workstations.

74.     The length of the Data Breach also demonstrates that Defendant failed to safeguard PII by, *inter alia*: maintaining an adequate data security environment to reduce the risk of a data breach; periodically auditing its security systems to discover intrusions such as malware and viruses like that deployed in the Data Breach; and retaining outside vendors to periodically test its network, servers, systems and workstations.

75.     Had Defendant undertaken the actions that it represented and promised consumers and patients it was providing, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as Defendant would have detected the Data Breach prior to the hackers encrypting Defendant's servers, systems, and workstations, and patients and consumers would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating actions sooner.

---

[34] *See Privacy Statement*, US Fertility, https://www.usfertility.com/privacy-statement/ (last visited Feb. 12, 2021).
[35] *See* Internet Engineering Task Force, *Deprecating Secure Sockets Layer Version 3.0*, available at: https://tools.ietf.org/pdf/rfc7568.pdf (last visited Feb. 15, 2021).

76.     Indeed, following the Data Breach, Defendant effectively conceded that its security practices prior thereto were inadequate and ineffective, and ultimately fell short of the standards to which healthcare providers are subject. In the Notice of Data Security Incident letter it belatedly sent to Plaintiff and others, Defendant acknowledged that the Data Breach required it to implement multiple remedial measures:

> to mitigate any risk of compromise to information involved and to better prevent a similar event from recurring: (1) fortified the security of our firewall; (2) utilized the forensic specialists engaged to monitor network activity and remediate any suspicious activity; (3) provided notification to potentially impacted individuals as quickly as possible. We are also adapting our existing employee training protocols relating to data protection and security, including training targeted at recognizing phishing emails. We believe these steps will be effective in mitigating any potential harm to individuals.

Indeed, that the Notice suggests the Data Breach may have been the direct and proximate result of an attack as unsophisticated and foreseeable as a phishing scam suggests Defendant, an entity created specifically to manage the information system of associated fertility clinics, simply was not up to the task.

### *Plaintiff and Class Members Suffered Harm Resulting from the Data Breach*

77.     Like any data hack, the Data Breach presents major problems for all affected. According to Jonathan Bowers, a fraud and data specialist at fraud prevention provider Trustev, "Give a fraudster your comprehensive personal information, they can steal your identity and take out lines of credit that destroy your finances for years to come."[36]

78.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers, financial information, and other sensitive data. As the FTC notes, "[t]hat's what thieves use most often to commit fraud or identity

---

[36] http://www.cnet.com/news/data-breach-snags-data-from-15m-t-mobile-customers/.

theft." And once they have this information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[37]

79.     The ramifications of Defendant's failure to properly secure consumer and patient PII, including Plaintiff's and Class members' PII, are severe. Identity theft occurs when someone uses another person's medical, financial, and personal information, such as that person's name, address, Social Security Number, medical and insurance information, financial account information, and other information, without permission to commit fraud or other crimes.

80.     According to data security experts, one out of every four data breach notification recipients became a victim of identity fraud.

81.     Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

   a.   Theft of PII, including protected health information;

   b.   Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the PII stolen during the Data Breach;

   c.   Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

   d.   Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, notifying their health insurance providers that their protected medical and health information was accessed by unauthorized persons, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, *if* they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

---

[37] https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

e.   The imminent and impending injury resulting from potential fraud and identity theft posed because their PII is exposed for theft and sale on the dark web; and

f.   The loss of Plaintiff's and Class members' privacy.

82.     Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII being accessed by cybercriminals.

83.     As a direct and proximate result of Defendant's actions and omissions in failing to protect and secure consumers' and patients' PII, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft. Indeed, had Defendant disclosed that it had failed to implement technological safeguards sufficient to protect their PII, Plaintiff and the Class would not have used the services provided by Defendant or its affiliated clinics, and would not have provided their PII to Defendant or its affiliated clinics, nor would they have done so had they known Defendant would fail to notify them of the Data Breach as soon as Defendant learned of it.

84.     Plaintiff and Class members retain an interest in ensuring there are no future breaches in addition to seeking a remedy for the harms suffered as a result of the Data Breach for themselves and on behalf of similarly situated consumers whose PII was involved in the Data Breach.

85.     Defendant is aware of the harm that Data Breaches cause to consumers and patients, as the notices that it posted and sent to patients and consumers regarding the Data Breach advise the victims to review their account statements, explanations of benefits, and credit reports for fraudulent or questionable activity.

## CLASS ALLEGATIONS

86.     Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose PII was accessed in the Data Breach of US Fertility's servers, systems, or workstations, or those of its affiliated clinics, that was announced on or about November 25, 2020.

Excluded from the Class are Defendant, its executives, officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

87.     In the alternative, Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons in Illinois whose PII was accessed in the Data Breach of US Fertility's servers, systems, or workstations, or those of its affiliated clinics, that was announced on or about November 25, 2020 (the "Illinois Subclass").

Excluded from the Illinois Subclass are Defendant, its executives, officers, and the Judge(s) assigned to this case.

88.     Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that tens of thousands of individuals comprise the Class and were affected by the Data Breach, because Defendant is one of the largest fertility networks in the United States, with 55 locations in more than a dozen States. The members of the Class will be identifiable through Defendant information and records in Defendant's possession, custody, and control.

89.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.  Whether Defendant's data security and retention policies were unreasonable;

    b.  Whether Defendant failed to protect the confidential and highly sensitive information with which they were entrusted;

    c.  Whether Defendant breached any legal duties in connection with the Data Breach;

    d.  Whether Defendant's conduct was intentional, reckless, willful or negligent;

    e.  Whether an implied contract was created concerning the security of Plaintiff's and Class members' PII;

    f.  Whether Defendant breached the implied contract by failing to protect and keep secure Plaintiff's and Class members' PII and/or failing to timely and adequately notify Plaintiff and Class members of the Data Breach;

    g.  Whether Defendant was unjustly enriched; and

    h.  Whether Plaintiff and Class Members are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

90.     <u>Typicality</u>: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their PII compromised in the Data Breach. Plaintiff and the members of the Class sustained damages as a result of Defendant's uniform wrongful conduct.

91.     <u>Adequacy</u>: Plaintiff is an adequate representative because her interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and intends to prosecute this action vigorously. Plaintiff and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are antagonistic to the interests of other members of the Class.

25

92.     <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

93.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

### CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT I — Negligence
**(On behalf of Plaintiff, the Class, and the Illinois Subclass)**

94.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

95.     This count is brought on behalf of all Class members.

96.     Defendant owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining, retaining, and securing the PII that Defendant collected.

97.     Defendant owed a duty to Plaintiff and the Class to provide security, consistent with industry standards and requirements, to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the PII that Defendant collected.

98.     Defendant owed a duty to Plaintiff and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of a data breach as soon as possible after it is discovered.

99.     Defendant owed a duty of care to Plaintiff and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

100.    Defendant solicited, gathered, and stored the PII provided by Plaintiff and the Class.

101.    Defendant knew or should have known it inadequately safeguarded this information.

102.    Defendant knew that a breach of its systems would inflict millions of dollars of damages upon Plaintiff and the Class, and Defendant was therefore charged with a duty to adequately protect this critically sensitive information.

103.    Defendant had a special relationship with Plaintiff and the Class. Plaintiff's and the Class's willingness to entrust Defendant with their PII was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the PII stored on them from attack.

104.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and the Class and their PII. Defendant's misconduct included failing to: (1) secure its systems, servers and workstations, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

105.    Defendant breached its duties to Plaintiff and the Class by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and the Class.

106.    Defendant breached its duties to Plaintiff and the Class by creating a foreseeable risk of harm through the misconduct previously described.

107.    Defendant breached the duties it owed to Plaintiff and the Class by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of PII.

108.    The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PII to Plaintiff and the Class so that Plaintiff and the Class could take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII.

109.    Defendant breached the duties it owed to Plaintiff and the Class by failing to timely and accurately disclose to Plaintiff and the Class members that their PII had been improperly acquired or accessed.

110.    Defendant breached its duty to notify Plaintiff and the Class by failing to publish any notice of the Data Breach until November 25, 2020, and failing to provide direct notice to Plaintiff and the Class of the Data Breach until January 8, 2021

111.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered a drastically increased risk of identify theft, relative to both the time period before the breach, as well as to the risk born by the general public.

112.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

28

## COUNT II – Negligence *Per Se*
### (On behalf of Plaintiff, the Class, and the Subclasses)

113.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

114.    This count is brought on behalf of all Class members.

115.    HIPAA obligates Covered Entities and Business Associates to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" and "must reasonably safeguard protected health information." 45 CFR § 164.530(c).

116.    In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq.*

117.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

118.    Defendant violated HIPAA and FTC rules and regulations obligating Business Associates and companies to use reasonable measures to protect PII by failing to comply with applicable industry standards; by falsely representing to its customers and the public the nature and scope of the Data Breach; and by unduly delaying reasonable notice of the actual breach. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, the foreseeable consequences of a Data Breach, and the foreseeable consequences of misleading its customers and the public.

29

119. Defendant's violations of HIPAA and Section 5 of the FTC Act constitutes negligence *per se*.

120. Plaintiff and the Class are within the category of persons HIPAA and the FTC Act were intended to protect.

121. The harm that occurred as a result of the Data Breach described herein relating to the Data Breach is the type of harm HIPAA and the FTC Act were intended to guard against.

122. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

**COUNT III – Breach of Implied Contract**
**(On behalf of Plaintiff, the Class, and the Illinois Subclass)**

123. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

124. This count is brought on behalf of all Class members.

125. In order to procure medical and other services from Defendant and its affiliated clinics, Plaintiff and Class members provided Defendant with their PII.

126. By providing their PII, and upon Defendant's acceptance of such information, Plaintiff and Class members, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

127. The implied contracts between Defendant and Class members obligated Defendant to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' PII. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. Defendant expressly adopted and assented to these terms in

30

its Notice of Privacy Policy, public statements, and representations and promised as described above.

128.    The implied contracts for data security also obligated Defendant to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their PII.

129.    Without said implied contracts, Plaintiff and Class members would not have provided their PII to Defendant or its affiliated clinics.

130.    Defendant breached the implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the PII of Plaintiff and Class members and allowing unauthorized persons to access Plaintiff's and Class members' PII, and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

131.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT IV – Bailment
### (On behalf of Plaintiff, the Class, and the Illinois Subclass)

132.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

133.    This count is brought on behalf of all Class members.

134.    Plaintiff and Class members delivered their PII to Defendant and its affiliated clinics for the exclusive purpose of transacting with Defendant and its affiliated clinics.

135.    In delivering their personal and financial information to Defendant, Plaintiff and Class members intended and understood that Defendant would adequately safeguard their PII.

136.    Defendant accepted Plaintiff's and Class members' PII for the purpose of facilitating transactions with Plaintiff and Class members.

137.    By accepting possession of Plaintiff's and Class members' PII, Defendant understood that Plaintiff and Class members expected Defendant to adequately safeguard their PII. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

138.    During the bailment (or deposit), Defendant owed a duty to Plaintiff and Class members to exercise reasonable care, diligence and prudence in protecting their PII.

139.    Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class members' PII, resulting in the unlawful and unauthorized access to and misuse of Plaintiff's and Class members' PII.

140.    Defendant further breached its duty to safeguard Plaintiff's and Class members' PII by failing to timely notify them that their PII had been compromised as a result of the Data Breach.

141.    Defendant failed to return, purge or delete the PII of Plaintiff and members of the Class at the conclusion of the bailment (or deposit) and within the time limits allowed by law.

142.    As a direct and proximate result of Defendant's breach of its duty, Plaintiff and Class members suffered consequential damages that were reasonably foreseeable to Defendant, including but not limited to the damages set forth herein.

143.    As a direct and proximate result of Defendant's breach of its duty, the PII of Plaintiff and Class members entrusted to Defendant during the bailment (or deposit) was damaged and its value diminished.

## COUNT V – Unjust Enrichment
### (On behalf of Plaintiff, the Class, and the Illinois Subclass)

144.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

145.    This count is brought on behalf of all Class members.

146.     Plaintiff and the Class have an interest, both equitable and legal, in their PII that was collected and maintained by Defendant. This PII was conferred on Defendant by Plaintiff and the Class members.

147.     Defendant was benefitted by the conferral upon it of Plaintiff's and Class members' PII and by its ability to retain and use that information. Defendant understood that it received these benefits.

148.     Defendant also understood and appreciated that the PII pertaining to Plaintiff and the Class was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

149.     But for Defendant's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and the Class members would not have transferred the PII to Defendant or entrusted their PII to Defendant, and Defendant would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining customers and patients, gaining the reputational advantages conferred upon it by Plaintiff and Class members, monetary savings resulting from failure to reasonably upgrade and maintain data infrastructures, staffing, and expertise raising investment capital as described herein, and realizing excessive profits.

150.     As a result of Defendant's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiff, the Class, its patients in general, and the public relating to the nature and scope of the Data Breach; its failure to employ adequate data security measures; its continued maintenance and use of the PII belonging to Plaintiff and Class members without having adequate data security measures; and its other conduct facilitating the unauthorized access and

theft of that PII) Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

151.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including compiling and using Plaintiff's and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion.

152.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and the Class in an unfair and unconscionable manner. Defendant retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

153.    The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain the benefit.

154.    Defendant is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the PII that was accessed and/or stolen in the Data Breach.

**COUNT VI – Violation of the Illinois Consumer Fraud and Deceptive Practices Act**
**(On behalf of Plaintiff and the Illinois Subclass)**

155.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

156.    This count is brought on behalf of all Illinois Subclass members.

157.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCA") prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent

that others rely upon the concealment, suppression or omission of such material fact. . . ." 815 ILCS 505/2.

158.    Plaintiff and the Illinois Subclass are "consumers" as defined by the ICFA.

159.    Defendant is a "person" as those terms are defined by the ICFA.

160.    Plaintiff and members of the Illinois Subclass transacted with Defendant primarily for personal, family or household purposes.

161.    Defendant's actions, as set forth above, occurred in the course of trade or commerce.

162.    Defendant's unlawful, unfair, deceptive, fraudulent and/or unconscionable acts and practices include:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Illinois Subclass members' PII, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which were direct and proximate causes of the Data Breach;

    c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass members' PII, including but not limited to duties imposed by the HIPAA and the FTC Act, which were direct and proximate causes of the Data Breach;

    d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Illinois Subclass members' PII, including by implementing and maintaining reasonable security measures;

    e.  Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and the Illinois Subclass members' PII;

    f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Illinois Subclass members' PII;

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass members' PII; and

h.  Failing to promptly and adequately notify Plaintiff and Illinois Subclass members that their PII was accessed by unauthorized persons in the Data Breach.

163.    Defendant's conduct constitutes unconscionable, deceptive, and unfair acts and practices.

164.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of customer and patient PII.

165.    Defendant intentionally, knowingly, and maliciously mislead Plaintiff and Illinois Subclass members and induced them to rely on its misrepresentations and omissions.

166.    Had Defendant disclosed to Plaintiff and Illinois Subclass members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Plaintiff's and Illinois Subclass members' PII as part of the services Defendant provided and for which customers paid without advising them that Defendant's data security practices were insufficient to maintain the safety and confidentiality of their PII. Accordingly, Plaintiff and the Illinois Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

167.    Defendant's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like HIPAA and the FTC Act.

168.    Defendant's violation of the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq.*, constitutes a violation of the ICFA.

169.    The injuries suffered by Plaintiff and Illinois Subclass members greatly outweigh any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiff and Illinois Subclass members should have reasonably avoided.

170.    The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiff and Class members as a direct result of Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices as set forth in this Complaint include, without limitation:

    a.    unauthorized charges on their debit and credit card accounts;

    b.    theft of their PII;

    c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    d.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse effects on their credit scores and adverse credit notations;

    e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection, informing their health insurance providers that their PII was exposed in the Data Breach, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

    f.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    g.    damages to and diminution in value of their personal and financial information entrusted to Defendant for the purpose of transacting with

Defendant and its affiliated clinics, and with the understanding that Defendant would safeguard their data against theft and not allow access and misuse of their data by others;

h.   money paid for products and/or services purchased from Defendant during the period of the Data Breach in that Plaintiff and Illinois Subclass members would not have purchased had Defendant disclosed that it lacked adequate systems and procedures to reasonably safeguard patient and customers PII and had Defendant provided timely and accurate notice of the Data Breach;

i.   overpayments made to Defendant for transactions during the Data Breach in that a portion of the price for such products and/or services paid by Plaintiff and the Illinois Subclass members to Defendant was for the costs of Defendant providing reasonable and adequate safeguards and security measures to protect patient and customers PII, which Defendant failed to do and, as a result, Plaintiff and Illinois Subclass members did not receive what they paid for and were overcharged by Defendant; and

j.   the continued risk to their PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect data in its possession.

171.   Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## COUNT VII – Violation of the Illinois Personal Information Protection Act
### (On behalf of Plaintiff and the Illinois Subclass)

172.   Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

173.   This count is brought on behalf of all Illinois Subclass members.

174.   The Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/1, *et seq.*, obligates "data collectors" that own, license, maintain or store records that contain personal information of Illinois residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45.

175.     Additionally, the IPIPA creates a duty for data collectors to notify Illinois residents of any data breach "immediately following discovery" of the data breach. 815 ILCS 530/10(b).

176.     Defendant is a "data collector" as defined by IPIPA.

177.     Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Illinois Subclass members' PII from unauthorized access or disclosure, as alleged herein.

178.     Defendant, knowing and/or reasonably believing that Plaintiff's and Illinois Subclass members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Illinois Subclass as required by IPIPA.

179.     Defendant's failure to implement and maintain reasonable security measures to protect consumer and patient PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the IPIPA.

180.     As a result of Defendant's failure to reasonably safeguard the PII belonging to Plaintiff and the Illinois Subclass, and Defendant's failure to provide reasonable and timely notice of the Data Breach to Plaintiff and the Illinois Subclass, Plaintiff and the Illinois Subclass have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT VIII – Violation of State Consumer Protection Statutes
### (On behalf of Plaintiff, the Class, and the Subclass)

181.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

182.     This count is brought on behalf of all Class members.

183. Plaintiff and Class members are consumers who purchased products from, and/or transacted with, Defendant primarily for personal, family or household purposes.

184. Defendant is a "person" as defined in the relevant state consumer statutes.

185. Defendant engaged in the conduct alleged herein in transactions intended to result, and which did result, in the sale of goods or services to consumers, including Plaintiff and Class members. Defendant is engaged in, and its acts and omissions affect, trade and commerce.

186. Defendant's acts, practices and omissions were done in the course of Defendant's business of marketing, facilitating, offering for sale, and selling goods and services throughout the United States.

187. Defendant's unlawful, unfair, deceptive, fraudulent and/or unconscionable acts and practices include:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PII, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII, including but not limited to duties imposed by the HIPAA and the FTC Act, which was a direct and proximate cause of the Data Breach;

    d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class members' PII, including by implementing and maintaining reasonable security measures;

    e. Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and the Class members' PII;

    f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PII;

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' PII; and

h.  Failing to promptly and adequately notify Plaintiff and Class members that their PII was accessed by unauthorized persons in the Data Breach.

188.    By engaging in such conduct and omissions of material facts, Defendant has violated state consumer laws prohibiting representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that "goods and services are of a particular standard, quality or grade, if they are of another", and/or "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"; and state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices.

189.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of patient and customer PII.

190.    Defendant intentionally, knowingly, and maliciously misled Plaintiff and Class members and induced them to rely on its misrepresentations and omissions.

191.    Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Plaintiff's and Class members' PII as part of the services Defendant provided and for which patients paid without advising them that Defendant data security practices were insufficient to maintain the safety and confidentiality of their PII. Accordingly, Plaintiff and the Class members acted reasonably in

41

relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

192.    Past breaches within the industry put Defendant on notice that its security and privacy protections were inadequate.

193.    Defendant's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like HIPAA and the FTC Act.

194.    The harm these practices caused to Plaintiff and the Class members outweighed their utility, if any.

195.    The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiff and Class members as a direct result of Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices as set forth herein include, without limitation:

        a.    unauthorized charges on their debit and credit card accounts;

        b.    theft of their PII;

        c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

        d.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse effects on their credit scores and adverse credit notations;

        e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection, informing their health insurance

providers that their PII was exposed in the Data Breach, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

f.      the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.      damages to and diminution in value of their personal and financial information entrusted to Defendant for the purpose of transacting with Defendant and its affiliated clinics, and with the understanding that Defendant would safeguard their data against theft and not allow access and misuse of their data by others;

h.      money paid for products and/or services purchased from Defendant during the period of the Data Breach in that Plaintiff and Class members would not have purchased had Defendant disclosed that it lacked adequate systems and procedures to reasonably safeguard patient and customers PII and had Defendant provided timely and accurate notice of the Data Breach;

i.      overpayments made to Defendant for transactions during the Data Breach in that a portion of the price for such products and/or services paid by Plaintiff and the Class members to Defendant was for the costs of Defendant providing reasonable and adequate safeguards and security measures to protect patient and customers PII, which Defendant failed to do and, as a result, Plaintiff and Class members did not receive what they paid for and were overcharged by Defendant; and

j.      the continued risk to their PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect data in its possession.

196.    Defendant's conduct described herein, including without limitation, Defendant's failure to maintain adequate computer systems and data security practices to safeguard patient and customers PII, Defendant's failure to disclose the material fact that it did not have adequate computer systems and safeguards to adequately protect patient and customer PII, Defendant's failure to provide timely and accurate notice to of the material fact of the Data Breach, and Defendant's continued acceptance of Plaintiff's and Class members' PII, including credit and banking information for transactions after Defendant knew or should have known of the Data

Breach, constitute unfair methods of competition and unfair, deceptive, unconscionable, fraudulent

and/or unlawful acts or practices in violation of the following state consumer statutes:

a.  The Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5(5), (7) and (27), *et seq.*;

b.  The Arizona Consumer Fraud Act, A.R.S. § 44-1522;

c.  The California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and the California Unfair Competition Law, Cal. Bus. and Prof. Code, § 17200, *et seq.*;

d.  The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

e.  The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (5) and (7), *et seq.*;

f.  The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), et seq.; and Idaho Code § 48-603C, *et seq.*;

g.  The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, et seq., and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. § 510/2(a)(5), (7) and (12), *et seq.*;

h.  The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13-301(1) and (2)(i), and (iv) and (9)(i), *et seq.*;

i.  The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), *et seq.*;

j.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

k.  The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), *et seq.*;

l.  New York Business Law, N.Y. Gen. Bus. Law § 349(a);

m.  The North Carolina Unfair Trade Practices Act N.C.G.S.A. § 75-1.1(a), *et seq.*;

n.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

o.  The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

p.  The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*; and

q.  The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq*.

197.   Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**COUNT IX – Violation of State Data Breach Statutes**
**(On behalf of Plaintiff, the Class, and the Illinois Subclass)**

198.   Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

199.   This count is brought on behalf of all Class members.

185.   Defendant is a business that owns, maintains, and licenses PII, and computerized data including PII, about Plaintiff and Class members.

191.   Defendant is in possession of PII belonging to Plaintiff and the Class and is responsible for reasonably safeguarding that PII consistent with the requirements of the applicable laws pertaining hereto.

192.   Defendant failed to safeguard, maintain, and dispose of, as required, the PII within its possession, custody, or control as discussed herein, which it was required to do by all applicable State laws.

193.   Defendant, knowing and/or reasonably believing that Plaintiff's and Class members' PII was acquired by unauthorized persons during the Data Breach, failed to provide reasonable and timely notice of the Data Breach to Plaintiff and the Class as required by following data breach statutes.

194.   Defendant's failure to provide timely and accurate notice of the data breach violated the following state data breach statutes:

a.   Alaska Stat. Ann. § 45.48.010(a), *et seq.*;

b.    Ark. Code Ann. § 4-110-105(a), *et seq.*;

c.    Cal. Civ. Code § 1798.83(a), *et seq.*;

d.    Colo. Rev. Stat. Ann § 6-1-716(2), *et seq.*;

e.    Conn. Gen. Stat. Ann. § 36a-701b(b), *et seq.*;

f.    Del. Code Ann. Tit. 6 § 12B-102(a), *et seq.*;

g.    D.C. Code § 28-3852(a), *et seq.*;

h.    Fla. Stat. Ann. § 501.171(4), *et seq.*;

i.    Ga. Code Ann. § 10-1-912(a), *et seq.*;

j.    Haw. Rev. Stat. § 487N-2(a), *et seq.*;

k.    Idaho Code Ann. § 28-51-105(1), *et seq.*;

l.    Ill. Comp. Stat. Ann. 530/10(a), *et seq.*;

m.    Iowa Code Ann. § 715C.2(1), *et seq.*;

n.    Kan. Stat. Ann. § 50-7a02(a), *et seq.*;

o.    Ky. Rev. Stat. Ann. § 365.732(2), *et seq.*;

p.    La. Rev. Stat. Ann. § 51:3074(A), *et seq.*;

q.    Md. Code Ann., Commercial Law § 14-3504(b), *et seq.*;

r.    Mass. Gen. Laws Ann. Ch. 93H § 3(a), *et seq.*;

s.    Mich. Comp. Laws Ann. § 445.72(1), *et seq.*;

t.    Minn. Stat. Ann. § 325E.61(1)(a), *et seq.*;

u.    Mont. Code Ann. § 30-14-1704(1), *et seq.*;

v.    Neb. Rev. Stat. Ann. § 87-803(1), *et seq.*;

w.    Nev. Rev. Stat. Ann. § 603A.220(1), *et seq.*;

x.    N.H. Rev. Stat. Ann. § 359-C:20(1)(a), *et seq.*;

y.    N.J. Stat. Ann. § 56:8-163(a), *et seq.*;

z.    N.C. Gen. Stat. Ann. § 75-65(a), *et seq.*;

aa.     N.D. Cent. Code Ann. § 51-30-02, *et seq.*;

bb.     Okla. Stat. Ann. Tit. 24 § 163(A), *et seq.*;

cc.     Or. Rev. Stat. Ann. § 646A.604(1), *et seq.*;

dd.     R.I. Gen. Laws Ann. § 11-49.3-4(a)(1), *et seq.*;

ee.     S.C. Code Ann. § 39-1-90(A), *et seq.*;

ff.     Tenn. Code Ann. § 47-18-2107(b), *et seq.*;

gg.     Tex. Bus. & Com. Code Ann. § 521.053(b), *et seq.*;

hh.     Utah Code Ann. § 13-44-202(1), *et seq.*;

ii.     Va. Code. Ann. § 18.2-186.6(B), *et seq.*;

jj.     Wash. Rev. Code Ann. § 19.255.010(1), *et seq.*;

kk.     Wis. Stat. Ann. § 134.98(2), *et seq.*; and

ll.     Wyo. Stat. Ann. § 40-12-502(a), *et seq.*

200.    As a result of Defendant's failure to reasonably safeguard the Plaintiff's and Class members' PII, and Defendant's failure to provide reasonable and timely notice of the Data Breach to its patients and customers, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

### COUNT X – Declaratory Judgment
**(On behalf of Plaintiff, the Class, and the Illinois Subclass)**

201.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

202.    This count is brought on behalf of all Class members.

203.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

204.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard its consumer and patient PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate.

205.     Plaintiff and Class members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

206.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendant continues to owe a legal duty to secure patient and consumer PII and to timely notify patients and consumers of any data breach and that Defendant is required to establish and implement data security measures that are adequate to secure patient and consumer PII.

207.     The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect patient and consumer PII.

208.     If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury and lack an adequate legal remedy. The threat of another breach of the PII in Defendant's possession, custody, and control is real, immediate, and substantial. If another breach of Defendant's network, systems, servers, or workstations occurs, Plaintiff and Class members will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

48

209.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Defendant, Plaintiff and Class members will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

210.    Issuance of the requested injunction will serve the public interest by preventing another data breach at Defendant, thus eliminating additional injuries to Plaintiff and the tens of thousands of Class members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.    That Plaintiff be granted the declaratory relief sought herein;

C.    That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.    That the Court award Plaintiff and the Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E.    That the Court award Plaintiff and the Class members statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

F.    That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.    That the Court award pre- and post-judgment interest at the maximum legal rate;

H.    That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.      That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Dated: February 17, 2021                    Respectfully submitted,

*/s/ James P. Ulwick*
James P. Ulwick (Fed. Bar No. 00536)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Telephone: (410) 752-6030
Facsimile: (410) 539-1269
julwick@kg-law.com

Daniel O. Herrera (*pro hac* admission anticipated)
Nickolas J. Hagman (*pro hac* admission anticipated)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com

Bryan L Clobes (*pro hac* admission anticipated)
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
205 N. Monroe St.
Media, Pennsylvania 19063
Telephone: (215) 864-2800
bclobes@caffertyclobes.com